993001IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 17-10327 |
| East West Copolymer, LLC, | Chapter 11 |
| *Debtor* | |

**MOTION FOR THE ENTRY OF ORDERS (I) APPROVING THE SALE OF ASSETS FREE AND CLEAR, (II) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES AND APPROVING THE PROCEDURES TO BE EMPLOYED WITH ASSUMPTION AND ASSIGNMENT, AND (IV) GRANTING RELATED RELIEF**

**NOW INTO COURT**, through undersigned counsel, comes East West Copolymer, LLC (the "Debtor" or "EWC"), who moves for the entry of Orders (i) approving the sale of assets free and clear; (ii) approving bid procedures in connection with the sale; (iii) approving the assumption and assignment of certain contracts and leases and approving the procedures to be employed with assumption and assignment; and (iv) grating related relief. In support, the Debtor represents:

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 363, 365 and Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure.

**General Background**

2.      Contemporaneously herewith, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.  The Debtor is a Delaware limited liability company that owns and operates a synthetic rubber manufacturing plant on Scenic Highway in Baton Rouge, Louisiana which produced a variety of cold polymerized emulsion rubber and other copolymer products, primarily for use in the tire industry. The operations of EWC required the use of certain toxic chemicals, specifically, butadiene, styrene, acrylonitrile and ammonia (the "Chemicals"). EWC presently has a stock of the Chemicals which must be preserved in an environmentally controlled facility to avoid degradation and potential environmental contamination.[1]

4.  Prior to the Petition Date, EWC obtained financing from Main Street. EWC entered into a certain Credit Agreement dates as of October 17, 2014[2] (the "Credit Agreement"). The Credit Agreement provided for the making of term loans to EWC. Under the Main Street financing package, EWC secured its borrowings from Main Street with a mortgage upon the immovable property and improvements thereon located at its north Baton Rouge facility along with a security interest in all the Debtor's movable property, including but not limited to machinery, equipment, raw materials, inventory, finished goods, accounts receivable and furniture located at such facility. As of the date of the filing of the petition, EWC owed Main Street the approximate sum of $13,500,000.00.

5.  While EWC was initially profitable, the market for its rubber and other synthetic chemical polymers declined. EWC competes with a number of international rubber and

---

[1] A large purpose of the chapter 11 filing is to obtain the use of cash collateral sufficient to continue disposal efforts of the Chemicals, as well as to avoid the cessation of electricity and other utilities (a termination notice with regard to the Debtor's electrical utility, Entergy, has been received and termination of services was scheduled by Entergy for April 10, 2017) which are necessary to preserve the Chemicals while disposal efforts are conducted.

[2] Reference to the Credit Agreement shall include any amendments, supplements, or other modifications thereto, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as any of such documents may themselves have been amended, restated, supplemented or modified in accordance with the terms thereof.

copolymer producers, and believes that precipitous price declines for its products have arisen due to below-cost dumping of product by foreign producers in the domestic market.

6. EWC engaged restructuring professionals to assist it with determining whether it could successfully emerge from the market turn-down. Additionally, EWC engaged at least two investment banks to assess the market for refinancing and/or a sale of its assets to a third party. The professionals worked with EWC to attempt to locate potential buyers for the assets and several parties indicated interest. However, after conducting due diligence, in each instance such interested parties notified EWC that they were not going to proceed with purchase of the EWC assets.

7. Since the shutdown of its revolving credit facility, EWC has been unable to locate additional financing. EWC has been operating based upon cash collections from its accounts receivable. Main Street, exercising its statutory and contractual rights, has issued notices to EWC's accounts receivable debtors to pay Main Street directly.

8. Left with little to no other options, EWC has been forced to enter into a wind-down of operations. The sole purpose of the continued operations during the budget period is two-fold: (i) disposal or treatment of the hazardous Chemicals, and clean-up of equipment on site at the EWC facility; and (ii) the sale of its operations or assets to a suitable purchaser.

**Relief Requested**

9. The Debtor seeks the entry of two Orders.

10. The first order (the "Bid Procedures Order")[3] (a) authorizing and approving bid procedures (the "Bid Procedures") to be employed in connection with the proposed sale and transfer (the "Sale") of the assets (the "Purchased Assets") of the Debtor, (b) scheduling an

---

[3] Attached hereto as **Exhibit 1**.

auction (the "Auction") and a hearing (the "Sale Hearing") to consider approval of the Sale, (c) authorizing and approving procedures (the "Assignment Procedures") to be employed in connection with the assumption and assignment of certain contracts (the "Assumed Contracts") and leases (the "Assumed Leases") of the Debtor, (d) approving the manner and form of notice of the auction with respect to the Sale, the Sale Hearing and the Assignment Procedures, substantially in the form attached to the Bid Procedures Order as Exhibit "2" (the "Sale Notice"), Exhibit "3" (the "Publication Notice") and Exhibit "4" (the "Assignment Notice") and (e) granting related relief. The Debtor requests a hearing on the Sale and Procedures Order on a special setting as a first day order and intends to move separately for such a hearing.

11. The second order (the "Sale Order")[4] (a) authorizing the sale of the Purchased Assets to the highest and best bidder, free and clear of liens, claims and interests, with liens, claims and interests attaching to the proceeds, by and through the Purchase and Sale Agreement, substantially in the form attached to the Bid Procedures Order as Exhibit "1" (the "Purchase Agreement"), (b) approving the Purchase Agreement of the (ii) the highest and best bidder and (ii) the second highest and best bidder; (c) determining that the Successful Bidder and Backup Bidder are good faith purchasers pursuant to 11 U.S.C. § 363(m); (d) approving the Assumption and Assignment of the Contracts and Leases; (e) abrogating the fourteen (14) day stay imposed by FED. R. BANKR. P. 6004(h); and (f) other related relief. The Debtor requests hearing on the Sale Consummation Order ("Sale Hearing") to occur within twenty-one days following the entry of the Sale and Procedures Order.

I.   **The Sale Free and Clear**

   A.   **Approval of Sale under § 363(b)(1)**

---

[4] Attached hereto as **Exhibit 2**.

12. This Motion contemplates that a Purchaser will buy the Purchased Assets through the relevant Purchase Agreement (attached to the Bid Procedures Order as Exhibit "1"). A summary of the terms of the proposed sale are as follows:[5]

- **Purchased Assets to be Purchased**. Some or all assets which were used in the Debtors business.

- **Excluded Purchased Assets**. None.

- **Purchase Price**. The amount bid by the Successful Bidder.

- **Break-Up Fee**. None.

- **Closing**. The sale of the Purchased Assets shall be closed within five (5) days from the entry of the Sale Order.

13. This purchase will be accomplished pursuant to 11 U.S.C. § 363, which provides that the Debtor, "after notice and a hearing, may […] sell […], other than in the ordinary course of business, property of the estate."[6]

14. The Court should approve the sale of the Purchased Assets to Purchaser if it finds that the Debtor demonstrates a sound business reason for the sale and the parties acted in good faith to sell the Purchased Assets at a fair and reasonable price.[7] Section 105(a) provides in

---

[5] This section is intended as a summary. For a full recitation of all terms and conditions, parties should consult the Purchase and Sale Agreement and the Bid Procedures. In the event of any conflict between the terms of the Purchase and Sale Agreement and any Order of this Court, the Order shall control.

[6] 11 U.S.C. § 363(b)(1). *See Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [Section] 363(b)(1) when a sound business purpose dictates such action."); *In re Gucci*, 126 F. 3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F. 2d 141, 143 (2d Cir. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

[7] *See In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) (holding that the proper standard to use when considering a proposed motion to sell is the business judgment test). *See also In re 240 N. Brand Partners*, 200 B.R. 653, 659 (9th Cir. B.A.P. 1996) (citing to *Lionel* for proposition that "debtors who wish to utilize section 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification.").

5

relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[8]

15. Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.[9]

16. Once a debtor articulates a valid business reason for a sale, the business judgment rule acts as a presumption that the debtor has acted on an informed basis, in good faith, and in the honest belief that the sale is in the best interests of the estate.[10]

17. The Debtors' decision to sell the Purchased Assets to Purchaser is based on its sound business judgment. The Debtor seeks to liquidate the Estate so that it may justly and equitably compensate creditors. The sale of the Purchased Assets will generate value for the Estate, and their sale will help expedite payment to the holders of allowed claims.

18. Here, each of the preceding four factors has been satisfied. The Debtor currently has inadequate liquidity to continue operating. In fact, the Debtor is not operating. The rapid, but orderly sale of the Purchased Assets will monetize the Purchased Assets for the benefit of the Debtor's creditors. As discussed above, the Debtor will be providing adequate and reasonable notice to interested parties of the opportunity to bid on the Purchased Assets and of the

---

[8] 11 U.S.C. § 105(a).

[9] See, e.g., In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

[10] See In re Gulf States Steel Inc. of Ala., 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("The Trustee is responsible for the administration of the estate and his or her judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met.").

opportunity to object to the sale of those assets.[11] The procedure proposed herein will provide for an open and competitive bidding process for the Purchased Assets. The Debtor is proceeding in good faith and will make a showing at the Sale Hearing that the purchaser of the Purchased Assets has acted in good faith. Courts generally conclude that parties have acted in good faith with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of the sale are disclosed fully.[12]

19. As previously discussed, the Purchase Price is fair and reasonable consideration for the sale of the Purchased Assets and represents the product of an open market bidding procedure and auction. The Auction and sale of the Purchased Assets pursuant to the Bid Procedures proposed herein should therefore be approved.

**B.  Approval of the Sale Under § 363(f)**

20. Pursuant to this motion, the Debtor also requests authorization to sell the Purchased Assets free and clear of any liens, claims, encumbrances, or other interests that may be asserted against the Purchased Assets. Section 363(f) provides for the sale of property of the estate by the debtor "free and clear of any interest in such property of any entity other than the estate."[13] Such "free and clear" provision permits a sale free and clear of interests beyond liens and permits a sale free and clear of claims,[14] contractual rights,[15] and statutory interests.[16]

---

[11] *See, e.g., Folger Adam Security Inc. v. DeMatteis/MacGregor*, 209 F. 3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); *In re WBQ P'ship*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property") (quoting *In re Karpe*, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).

[12] *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F. 2d 143, 149-50 (3d Cir. 1986).

[13] 11 U.S.C. § 363(f).

[14] *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d. Cir. 2003)

7

21. Section 363(f) permits a debtor to sell "free and clear" of an interest if any one of the following conditions is satisfied:

1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

2) the lienholder or claimholder consents;

3) such interest is a lien, and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4) such interest is in bona fide dispute; or

5) the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[17]

In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims, or encumbrances under Section 105 of the Bankruptcy Code.[18]

46. While Section 363(f) permits the sale of assets "free and clear of any interests," the term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code.[19] In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest."[20] The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the

---

[15] See *Unsecured Creditors' Comm. of Robert L. Helms Constr. & Development v. Southmark Corp.*, 139 F.3d 702 (9th Cir. 1998)

[16] See *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 543-548 (7th Cir. 2003)).

[17] 11 U.S.C. § 363(f).

[18] See *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

[19] *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).

[20] *Id.* at 258.

property."[21] As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."[22] Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Estate's sale of the Purchased Assets free and clear of all interests and claims, except with respect to any interests and claims that may be assumed liabilities under the applicable sale agreement.[23]

22. According the information in the possession of undersigned counsel, the Liens, Claims and Interests against and/or in which the Purchased Assets which are known to the Debtor as of the filing of this motion are listed on **Exhibit 3**. Undersigned counsel will supplement this Motion if additional Liens, Claims and Interests are discovered.

23. The Debtor requests that the Court approve any sale of the Purchased Assets as free and clear on any liens, claims and interests whether now known, with any such liens, claims and interests attaching instead to the proceeds of any such sale. Moreover, the Debtor proposes to hold any proceeds realized from a Court-approved sale until such time as further proceedings are had to determine the validity, priority and extent of such liens, claims and interests are determined.

---

[21] *Id.* at 258 (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).

[22] *Folger Adam*, 209 F.3d at 258.

[23] *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

### III. Approval of Bid Procedures

24. The Debtor requests that this Court approve the attached Bid Procedures (set forth in the proposed order attached as Exhibit 1) for the implementation of the sale process. The Bid Procedures provide a (a) structured marketing and overbid qualification process, (b) overbid and auction methodology and (c) bid selection and closing framework. The Bid Procedures may be summarized as follows:

   a. **Due Diligence**. The Bid Procedures establish a procedure for parties interested in the Purchased Assets to gain access to due diligence materials needed to review prior to making an "as is, where is" offer.

   b. **Qualified Bidders**. In order to qualify as a bidder for the Purchased Assets, the Bid Procedures require that interested parties (a) an executed confidentiality agreement, (b) provide a 10% deposit that remains non-refundable through the closing of the sale if they are selected as the Successful or Back-up Bidder, and (c) an executed asset purchase agreement on substantially the terms of, or on more favorable terms than those set forth in, the form of Asset Purchase Agreement attached to the Bid Procedures Order as Exhibit "1", which asset purchase agreement shall (a) specify the amount of cash or other form of consideration acceptable to the Debtor (in consultation with the Consultation Party), offered by the bidder for the Purchased Assets, (b) constitute an irrevocable offer by such the bidder to complete its proposed purchase upon the terms set forth therein, and must be irrevocable until closing of the Sale of the Purchased Assets to the Successful Bidder, (c) include a copy of a board resolution or similar document demonstrating the authority of the bidder to submit an offer to purchase the Purchased Assets on the terms proposed by such the bidder and identifies the officer(s) or authorized agent(s) appearing on behalf of the bidder, and (d) be accompanied by a marked-up version of such asset purchase agreement reflecting changes from the Agreement(e) acknowledge that it will not be entitled to a break-up fee, termination fee, expenses, or substantial contribution claim of any type.

   c. **Credit Bidding**. The Bid Procedures do not prohibit credit bidding.

   d. **Bids**. Qualified Bidders are required to submit a bid of at least the Minimum Bid by no later than 4:20 p.m., _____, 2017, via email to Mr. P. Douglas Stewart, Jr., dstewart@stewartrobbins.com to be eligible to participate in the auction of the Purchased Assets. The bid must be made using the Debtor's Purchase Agreement, which allow for the bidder's name and amount of offer, and be accompanied by acknowledgments that (a) that it will not be entitled to a break-up fee, termination fee, expenses, or substantial contribution claim of any

10

type and (b) that the bid is not conditioned upon financing or internal approval of any type.

e.  **No Bids/One Qualified Bid**. In the event the Debtor does not receive one or more Qualified Bids, the Debtor shall, in its sole and absolute discretion, either (i) extend the Bid Deadline for thirty (30) days, or (ii) not conduct an Auction and modify the Order granting relief from the automatic stay to the Administrative Agent to allow such agent to immediately foreclose on the Purchased Assets. In the event the Debtor receives only one Qualified Bid, the Debtor shall (i) cancel the Auction, (ii) announce such Qualified Bid as the Successful Bidder (as defined below), (iii) request at the Sale Hearing that the Bankruptcy Court approve the Sale of the Purchased Assets to the Successful Bidder, and (iv) request that the Sale Order be immediately effective upon entry.

f.  **The Auction**. The Bid Procedures establish an auction process, should there be more than one Qualified Bidder. The auction will occur at the offices of Stewart Robbins & Brown LLC, 620 Florida Street; Suite 100, Baton Rouge, LA 70801 on the day of the Sale Hearing. After announcing the current high bid, the Debtor will preside over an auction using $100,000.00 bidding increments, ultimately leading to the selection of a Successful Bidder and Back-up Bidder.

g.  **Break-up Fee**. None.

h.  **Court Approval of Successful and Back-up Bidders.** Immediately after the auction in open court, the Debtor will present the bids he considers the Successful and Back-up Bids to the court for approval.

i.  **Failure to Consummate Purchase**. Should the Successful Bidder fail to consummate the sale within five (5) days of the issuance of the Sale Consummation Order, the Debtor will call upon the Back-up Bidder to close the sale and the Successful Bidder shall forfeit its Deposit. Should the Back-up Bidder fail to close the sale, the Back-up Bidder will likewise forfeit its deposit.

25.   "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."[24] In furtherance of that goal, bidding procedures, such as those proposed here, may be used in court-

---

[24] John J. Jerome & Robert D. Drain, *Bankruptcy Court is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991.

supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers" and ultimately, maximize value.[25]

26. The Bid Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.

27. The Debtor believes that the Bidding Procedures are appropriate under 11 U.S.C. §§ 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for the estate and its creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.

28. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. Thus, the Debtor and all parties in interest can be assured that the consideration for the Purchased Assets will be fair and reasonable. At the same time, the Bidding Procedures provide the Debtor with the opportunity to consider all competing offers and to select, in his reasonable business judgment the highest and best offer for the Purchased Assets.

29. The Debtor submits that the Bidding Procedures proposed herein are fair and appropriate under the circumstances, consistent with the procedures routinely approved by courts in this state and in the best interest of the Estate. The Debtor believes that it is imperative that he promptly move forward in hope that higher and better offers are generated for the Purchased Assets. Accordingly, the Bidding Procedures were developed consistent with the Estate's need to expedite the sale process, but with the objective of promoting further active bidding that will

---

[25] *See id. See also In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets.").

result in the highest or better offer for the Purchased Assets. The Bidding Procedures are designed to facilitate the orderly, yet competing, bidding to maximize the net value realized from the sale by the Estate. In particular, the Bidding Procedures contemplate an auction process with minimum (but appropriate) barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

30.     At the same time, the bidding procedures provide the Debtor with an adequate opportunity to consider competing bids and select the highest and best offer for the completion of the sale. Entering into the Purchase and Sale Agreement with Purchaser ensures the Estate obtains fair market value by setting a minimum purchase price that will be tested in the marketplace. As such, the Debtor's creditors can be assured that, taking into account the financial condition of the Debtor and the economy, the consideration obtained will be fair and reasonable and at or above market.

### IV.    Assumption and Assignment

27.     By this motion, the Debtor requests the assumption of the Contracts and Leases pursuant to 11 U.S.C. § 365 and FED. R. BANKR. P. 6006 and 9014, and the assignment to the Successful Bidder in association with the purchase of the Purchased Assets. In association therewith, the Debtor seeks approval of the Assignment Procedures, which will govern the determination any cure payments and objections. The Assignment Procedures are set forth in that proposed order attached hereto as Exhibit 1.

28.     Pursuant to Section 365 of the Bankruptcy Code, the Debtor can assume or reject any unexpired lease or executory contract. But if there has been a default, the Debtor can only assume: after curing any default or providing adequate assurances of promptly curing any

default; and (ii) providing adequate assurances of future performance. 11 U.S.C. §§ 365(a), 365(b) and 365(b)(C). The Debtor's decision to assume or reject agreements under § 365 is governed by the business judgment test. Richmond Leasing Company v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).

29. The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice with approval withheld if the "judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." See Lubrizol Enters. v. Richmond Metal Finishes, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986); Allied Technology, Inc. v. R.B. Brueman & Sons, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982).

30. The Debtors submit that the assumption and assignment of the Contracts and Leases is in the best interests of the estate. The Contracts and Leases were all utilized in the Debtor's conduct of business. The assumption and assignment to the Successful Bidder will help maximize the value of the Purchased Assets.

### V. Procedure Where There Exists no Qualified Bidder

31. Should no party wish to bid on the Assets, or no potential purchaser qualify as a bidder, the Auction shall be cancelled, the § 362 automatic stay shall be modified to allow the immediate foreclosure by Main Street and Main Street shall credit the Debtor in an amount equal to the greater of one and a half times the highest offer made on the Assets by a non-qualifying buyer or two million dollars.

## VI. Relief from Bankruptcy Rule 6004(h) is Appropriate

32. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, lease of property... is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).

33. All creditors and interested parties will receive notice of the sale or a competing transaction and will be provided with an opportunity to be heard. The Debtor submits that such notice is adequate for entry of an order approving this motion and waiving the fourteen (14) days waiting period under Bankruptcy Rule 6004(h).

## VII. Purchaser Acted in Good Faith

34. A condition to the consummation of the purchase of the Purchased Assets is that the Court find that the ultimate purchaser has acted in "good faith" within the meaning of 11 U.S.C. § 363(m). Section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) or (c)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith."[26]

35. The good-faith requirement in § 363(m) is not specifically defined. Many courts turn to "traditional equitable principles and [hold] that the phrase encompasses one who purchases in good faith and for value."[27] "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the debtor, or an attempt to take grossly unfair advantage of other

---

[26] 11 U.S.C. § 363(m).

[27] *Hytken v. Williams*, 2007 U.S. Dist. LEXIS 27671, *14 (S.D. Tex. Mar. 30, 2007) (quoting *In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997), *aff'd*, 2008 U.S. App. LEXIS 12240 (5th Cir. June 6, 2008) (per curiam).

bidders.'"[28] "The requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings."[29] The good-faith requirement prohibits "fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale."[30]

36.   A bankruptcy court is not required to make an explicit finding of good faith in order to authorize a sale under the Bankruptcy Code.[31] Although the Bankruptcy Code does not define "good faith purchaser," courts interpreting Section 363(m) of the Bankruptcy Code have held that "to show lack of good faith [a party] must show fraud, collusion… or an attempt to take grossly unfair advantage of other bidders."[32] Yet, because there is no bright line test, courts examine the facts of each case by concentrating on the "integrity of [an actor's] conduct during the sale proceedings."[33]

37.   Under these standards – and by any other – the Successful Bidder has acted in good faith. The Purchase and Sale Agreement, and the sale of the Purchased Assets pursuant

---

[28] *Hytken*, 2007 U.S. Dist. LEXIS 27671 at **14-15 (quoting *Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc.*, 212 B.R. 283, 290 (N.D. Ohio 1997) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

[29] *Id.* at *15 (quoting *Rock Indus.*, 572 F.2d at 1198).

[30] *Id.* (quoting *In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005)).

[31] *See In re Zinke*, 97 B.R. 155, 156 (E.D.N.Y. 1989) (finding that a duty to make an explicit finding of good faith before permitting a sale "has not been imposed by the Second Circuit or the United States Supreme Court").

[32] *In re Coated Sales, Inc.*, No. 89 Civ. 37-4 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990). *See also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Asocs., Ltd.*, 706 F. 2d 301, 305 (10th Cir. 1983)).

[33] *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus.*, 572 F.2d at 1198). *See also In re Abbotts Dairies of Pa., Inc.*, 788 F. 2d 143, 147 (3d Cir. 1986) ("The requirement that a purchaser act in good faith…speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (citations omitted).

thereto, is the product of an open market sale. The consideration to be received by the Estate is substantial, fair and reasonable. Debtor will supplement this with any additional relevant facts following the Sale Consummation Hearing, additional facts will be shown. At such time, this Court should find that the Successful Bidder should be considered a "good faith purchaser" within the meaning of § 363(m) with respect to the Purchase and Sale Agreement and the sale of the Purchased Assets.

### VIII. Notice

38. The Debtor intends to notice a full copy of this motion and exhibits on the (a) United States Trustee, (b) all potential holders of liens and interests against property of the Estate which the Debtor is aware according to a review of current available information records, (c) all creditors that have filed a proof of claim, and (d) all parties that have requested notice in this case.

39. In addition, Debtor proposes to provide the following:

a. The Sale Notice is reasonably calculated to provide parties in interest with proper notice of the potential sale of the Purchased Assets, the related Bid Procedures, the Sale Hearing, the structure of the Sale and related implication on interested parties, including, without limitation, creditors, customers, suppliers and employees.

b. The Assignment Notice is reasonably calculated to provide all counterparties to the Assumed Contracts and Assumed Leases with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases and Cure Payment Liabilities (as defined below) relating thereto and the Assignment Procedures.

c. Publication of the Publication Notice is reasonably calculated to provide all potential claimants and all unknown creditors and parties not otherwise required to be served

with a copy of the Sale Notice pursuant to this Order with proper notice of the potential sale of the Purchased Assets, the related Bid Procedures, the Auction and the Sale Hearing.

**WHEREFORE**, the Debtor requests the entry of two Orders:

The first order (the "Bid Procedures Order")[34] (a) authorizing and approving bid procedures (the "Bid Procedures") to be employed in connection with the proposed sale and transfer (the "Sale") of the assets (the "Purchased Assets") of the Debtor, (b) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to consider approval of the Sale, (c) authorizing and approving procedures (the "Assignment Procedures") to be employed in connection with the assumption and assignment of certain contracts (the "Assumed Contracts") and leases (the "Assumed Leases") of the Debtor, (d) approving the manner and form of notice of the auction with respect to the Sale, the Sale Hearing and the Assignment Procedures, substantially in the form attached to the Bid Procedures Order as Exhibit "2" (the "Sale Notice"), Exhibit "3" (the "Publication Notice") and Exhibit "4" (the "Assignment Notice") and (e) granting related relief. The Debtor requests a hearing on the Sale and Procedures Order on a special setting as a first day order and intends to move separately for such a hearing.

The second order (the "Sale Order")[35] (a) authorizing the sale of the Purchased Assets to the highest and best bidder, free and clear of liens, claims and interests, with liens, claims and interests attaching to the proceeds, by and through the Purchase and Sale Agreement, substantially in the form attached to the Bid Procedures Order as Exhibit "1" (the "Purchase Agreement"), (b) approving the Purchase Agreement of the (ii) the highest and best bidder and (ii) the second highest and best bidder; (c) determining that the Successful Bidder and Backup Bidder are good faith purchasers pursuant to 11 U.S.C. § 363(m); (d) approving the Assumption

---

[34] Attached hereto as **Exhibit 1**.

[35] Attached hereto as **Exhibit 2**.

and Assignment of the Contracts and Leases; (e) abrogating the fourteen (14) day stay imposed by FED. R. BANKR. P. 6004(h); and (f) other related relief. The Debtor requests hearing on the Sale Consummation Order ("Sale Hearing") to occur within twenty-one days following the entry of the Sale and Procedures Order.

        Respectfully Submitted,

        **STEWART ROBBINS & BROWN LLC**
        P. O. Box 2348
        620 Florida Street; Suite 100 (70801)
        Baton Rouge, LA 70821-2348
        (225) 231-9998 Telephone
        (225) 709-9467 Fax

By:   */s/ Paul Douglas Stewart, Jr.*
       **Paul Douglas Stewart, Jr. (La. #24661)**
       dstewart@stewartrobbins.com
       **William S. Robbins (La. # 24627)**
       wrobbins@stewartrobbins.com
       **Ryan J. Richmond (La. # 30688)**
       rrichmond@stewartrobbins.com

       *Attorneys for East West Copolymer, LLC*